IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN K. PERRY,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Petitioner,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀Case No.  4:14-cv-00279-AGF
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
UNITED STATES OF AMERICA,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Respondent.⠀⠀⠀⠀⠀)

## MEMORANDUM AND ORDER

⠀⠀⠀⠀This matter is before the Court on Petitioner John K. Perry's motion under 28

U.S.C. § 2255 to vacate, set aside, or correct his sentence.  On February 28, 2012, a jury

convicted Petitioner of four counts of willful income tax evasion in violation of 26 U.S.C.

§ 7201, for failing to report and then concealing kickbacks received from vendors of Ford

Motor Company during each of the 2001 through 2004 tax years.  This Court sentenced

Petitioner to 51 months in prison.  On May 6, 2013, the Eighth Circuit Court of Appeals

affirmed the conviction and sentence.  *United States v. Perry*, 714 F.3d 570 (8th Cir.

2013).

⠀⠀⠀⠀Petitioner now moves to set aside his conviction and sentence, asserting four

grounds of ineffective assistance of defense counsel[1] and one ground of prosecutorial

---

[1]⠀⠀⠀⠀Although Assistant Federal Public Defender Thomas F. Flynn represented
Petitioner at his initial appearance and arraignment, Petitioner thereafter retained
Timothy Dempsey, referred to herein as "defense counsel," and Dempsey replaced Flynn
as Petitioner's counsel after arraignment and through the filing of pretrial motions, trial,
sentencing, and appeal.  Sometime after the appeal, Petitioner retained new counsel,
Kevin Schriener, to represent him in connection with this § 2255 motion.

misconduct. Petitioner claims that defense counsel was ineffective in (1) failing to seek to exclude or limit "unnecessary and unfairly prejudicial details" of Petitioner's involvement in the kickback scheme that was the source of Petitioner's unreported taxable income; (2) failing to seek to exclude Petitioner's ex-wife Tamara ("Tammy") Perry's testimony based on the marital confidential communications privilege; (3) failing to impeach the credibility of a key government witness, IRS Special Agent Julie Ricchio; and (4) misadvising Petitioner during the plea bargaining stage. For his claim of prosecutorial misconduct (Ground Five), Petitioner claims that the prosecutor knowingly elicited the false testimony of a witness, and failed to correct defense counsel's mistaken impression that money seized from Petitioner in a separate civil forfeiture action could be used to pay Petitioner's restitution liability in this case.

On January 30, 2016, the Court held an evidentiary hearing on Petitioner's claims of ineffective assistance of counsel during the plea bargaining stage (Ground Four). Petitioner was represented by private counsel, Schriener, at the evidentiary hearing. Based on the entire record, and having had the opportunity to observe and evaluate the demeanor of the witnesses at the hearing, Petitioner's motion will be denied.

## BACKGROUND

### Criminal and Civil Forfeiture Proceedings

On August 16, 2006, Special Agent Ricchio, with the IRS Criminal Investigation Division, executed a search warrant to search Petitioner's residence in Vermillion, Ohio. The search warrant was based on allegations by Tammy Perry and Thomas Moore, an employee of Ford vendor Thomas Buske, that Petitioner received kickbacks from Buske

while Petitioner was employed as the Materials, Planning, and Logistics Manager at Ford. During the search, Ricchio interviewed Petitioner, and informed him that the search was being conducted because the government believed that Petitioner was involved in a scheme in which he used his position at Ford to approve fraudulent invoices from one of Buske's companies. Petitioner denied involvement in any such fraudulent invoice scheme and denied receiving cash payments or kickbacks from Buske. Also during the search, federal agents seized several "cut sheets" from a safe in Petitioner's house. These cut sheets appeared to be handwritten ledgers of payments from Buske.

Meanwhile, in the Eastern District of Wisconsin, the government seized approximately $660,000 from Petitioner's TD Ameritrade account and initiated a separate civil action in January 2007, in the United States District Court for that district, to forfeit the funds as proceeds of a money laundering conspiracy involving Petitioner and Buske. *See United States v. Approximately $659,990.83 in U.S. Currency in TD Ameritrade Account Ending in 0902 Held in the Name of John K. Perry*, No. 2:07-cv-00264, Order Granting Motion to Stay (E.D. Wis. Mar. 20, 2008). Petitioner was represented by a different attorney in the Wisconsin civil forfeiture action.

Petitioner was indicted in this Court on March 24, 2011, on four counts of willful income tax evasion in violation of 26 U.S.C. § 7201, for failing to report and then concealing kickbacks received from Ford vendors during each of the 2001 through 2004 tax years. A superseding indictment was returned on July 14, 2011, charging Petitioner with the same four counts but adding allegations that the alleged offenses continued until August 16, 2006. Each count of the superseding indictment charged that Petitioner

3

willfully attempted to evade taxes by preparing and filing a false and fraudulent income tax return for the tax year at issue, "and by making false statements to an IRS Special Agent regarding income."

On May 27, 2011, an evidentiary hearing was held on Petitioner's pretrial motions, including a motion to dismiss the indictment based on the statute of limitations, before Magistrate Judge Frederick Buckles. Special Agent Ricchio testified on behalf of the government, and Petitioner testified on his own behalf, regarding Petitioner's statements during the August 16, 2006 search and interview. As relevant to Petitioner's § 2255 claims, Ricchio also answered the government's questions about how the search was conducted. Ricchio testified that approximately 13 federal agents were present with her during the search, but that she did not recall any local police being present. She further testified that she did not frisk Petitioner during the search and that she did not observe Petitioner being frisked by any other agents.

The Court adopted the Magistrate Judge's Report and Recommendation to deny the motion to dismiss upon finding that, if the government was able to prove at trial that Petitioner made false statements to Ricchio during the August 16, 2006 interview, those false statements would constitute affirmative acts of evasion rendering the criminal charges timely filed within the six-year statute of limitations.

Trial commenced on February 21, 2012.[2] At no point during the trial did Petitioner indicate a desire to reinitiate plea discussions. At trial, the government

---

[2] The trial concluded before the United States Supreme Court's decisions in *Lafler v. Cooper*, 566 U.S. 156 (2012) and *Missouri v. Frye*, 566 U.S. 133 (2012), and thus, no

introduced evidence that Buske paid Petitioner substantial kickbacks in the form of cash and indirect payments for his role in various fraudulent schemes. The government also introduced the cut sheets found in Petitioner's safe, which documented the kickbacks. In addition to the payments and kickbacks from Buske, the government introduced evidence that Petitioner pressured the owners of Ford vendor Syms Trucking, Floyd and Susan Wright, to buy Petitioner a truck, to pay for a cruise, and to pay Petitioner $10,000 to $20,000 per month, to keep their contract with Ford. The monthly payments were disguised as "consulting fees." The government introduced evidence that Petitioner failed to report the above-noted kickbacks and bribes as income on his tax returns for the 2001 through 2004 tax years, except for the payments disguised as consulting fees.

Specifically, on direct examination, Tammy Perry testified that Petitioner received money from the Wrights even though Petitioner provided no consulting services to the Wrights' company. Tammy Perry testified that Petitioner and the Wrights had a falling out and agreed to end their relationship, with the Wrights paying Petitioner $200,000 in four $50,000 installments.

Tammy Perry also testified that she deposited cash Petitioner received from Buske in a joint bank account owned by Petitioner and her, in deposits less than $5,000, at Petitioner's direction. She testified that Buske purchased a Jaguar and Lincoln Aviator for the couple, paid for an addition to the couple's home in Lake St. Louis, Missouri, and made the down-payment and mortgage payments on two homes for the couple in

---

colloquy was held prior to trial regarding the parties' plea negotiations.

Colorado, which were eventually quit-claimed to Petitioner for no consideration. She further testified that the home the couple owned in Breckenridge, Colorado was not investment property, as Petitioner had told federal agents, and that Petitioner created fictitious promissory notes to disguise Buske's payments as loans. Finally, she identified Petitioner's handwriting on the cut sheets taken from Petitioner's safe. On cross-examination, Tammy Perry acknowledged that she had signed a proffer letter which provided that the government could not use her testimony in a prosecution against her.

The government also called David Seib, one of Buske's employees, as a witness. Seib testified on direct examination that, while working for Buske, Seib sometimes submitted inflated bills to Petitioner at Ford per Petitioner's request. Seib recounted one instance at some point between the years 2000 and 2002, when Seib submitted an invoice for approximately $2 million to $2.4 million to Petitioner. Seib initially submitted the invoice for a lower amount, but Petitioner instructed Seib to review and resubmit the invoice at the higher amount. Consequently, Seib and another employee of Buske created false documentation and resubmitted the invoice at the higher $2 million to $2.4 million amount that Petitioner requested. Seib also identified Petitioner's handwriting on the cut sheets.

On cross-examination, when asked by defense counsel whether he previously told federal agents, during a February 2009 interview, that he had not prepared or instructed anyone to prepare false invoices while employed by Buske, Seib could not recall doing so. Seib also denied signing a proffer letter, but on redirect, after the government showed

him a copy of his signed proffer letter, Seib acknowledged that he had signed a proffer letter but stated that he had forgotten doing so.

Floyd Wright, co-owner of Syms Trucking, also testified as a witness for the government. Wright recounted how after Syms Trucking obtained a contract to provide services to Ford, Petitioner asked Wright to pay for Petitioner and Petitioner's son to go on a cruise, and also asked Wright to buy Petitioner a pickup truck. Wright further testified that he paid Petitioner $10,000 to $20,000 a month in "consulting" fees, even though Petitioner never provided any consulting services. Wright testified that he provided these payments and gifts because he was intimidated by Petitioner and afraid of losing Ford's business. Wright testified that he eventually agreed to end his relationship with Petitioner by paying Petitioner $200,000 in four $50,000 installments.

Finally, the government called Special Agent Ricchio to testify on matters including the tax loss computation and the execution of the search warrant on August 16, 2006. Ricchio recounted her interview with Petitioner, in which Petitioner denied involvement in a fraudulent scheme against Ford, denied receiving any cash payments from Buske, and stated that any payment Buske made toward the purchase of Petitioner's home was, in fact, for a joint investment. Ricchio also testified that she did not recall any county sheriffs at the search but that local police were notified of the search and a uniformed police officer was present when the federal agents made entry. In response to questioning as to whether Petitioner was frisked by one of the federal agents, Ricchio testified: "That could be, yes."

After closing arguments and as part of the final jury instructions, the Court instructed the jury that Seib and Tammy Perry each received a promise from the government that their testimony would not be used against them in a criminal case, and that whether the testimony of those witnesses may have been influenced by the government's promise was for the jury to determine.

On February 28, 2012, the jury returned guilty verdicts on all four counts. At sentencing, the Court determined that the advisory guidelines sentencing range was 51 to 63 months, and on May 31, 2012, the Court sentenced Petitioner at the low-end of the guidelines, to 51 months in prison, to be followed by 36 months of supervised release. As a condition of supervised release, the Court ordered Petitioner to pay restitution to the IRS in the amount of $926,602.75, constituting $578,226 in unpaid taxes and $348,376.75 in interest. In doing so, the Court rejected Petitioner's argument, raised by defense counsel in objection to the presentence investigation report ("PSR"), that interest should not be added to the restitution order.

The Court also heard argument on the issue of whether the seized funds from the Wisconsin civil forfeiture action could be applied to offset Petitioner's restitution liability. Ultimately, the Court declined to address the issue because the civil forfeiture action was still pending at that time, and as such, it was unclear whether the seized funds would ultimately be forfeited and, if so, whether and to what extent they would be distributed to victims of Petitioner's fraudulent schemes or be retained by the government. However, the Court ordered that, because the seized funds were being held

in an interest-bearing account, any interest ultimately retained by the government would offset the interest portion of Petitioner's restitution obligation.

On direct appeal, Petitioner argued that the Court erred in denying certain of his pretrial motions. Petitioner also argued that his objections to the tax loss computation should not have been overruled; that his sentence was objectively unreasonable; and that the restitution order was inappropriate. In an opinion issued on May 6, 2013, the Eighth Circuit rejected these arguments, and affirmed Petitioner's conviction and sentence. *United States v. Perry*, 714 F.3d 570 (8th Cir. 2013). With respect to Petitioner's challenge to the restitution order, the Eighth Circuit affirmed the inclusion of interest. The Eighth Circuit also agreed with this Court that the issue of whether the seized funds could offset Petitioner's restitution liability could not be determined until the final resolution of the civil forfeiture action, at which time "the district court [would] retain authority to modify the amount of restitution as may be appropriate." *Id.* at 578-79.

On January 22, 2014, Petitioner, through his attorney in the Wisconsin civil forfeiture action, entered a "Stipulation for Compromise Settlement" with the government in that action, in which the parties agreed that $248,922.36 of the seized funds would be applied toward the restitution owed in Petitioner's Missouri criminal case. (Doc. No. 8-2 at 1-4.)

## **Motion to Vacate**

As noted above, Petitioner now asserts four grounds of ineffective assistance of counsel and one ground of prosecutorial misconduct.

For Ground One, Petitioner argues that defense counsel was ineffective for failing to seek exclusion of, or a limiting instruction with respect to, "unfairly prejudicial details" of Petitioner's involvement in schemes the government used to prove the source of Petitioner's unreported taxable income, including Wright's testimony regarding Petitioner's intimidation tactics.

For Ground Two, Petitioner argues that defense counsel was ineffective for failing to seek to exclude Tammy Perry's testimony on the ground that such testimony was protected by the martial confidential communications privilege.   Specifically, Petitioner argues that defense counsel should have sought to exclude Tammy Perry's testimony regarding the Wrights' and Buske's cash payments to Petitioner, Buske's purchase of vehicles and homes for the couple, Petitioner's conduct in disguising Buske's payments as loans, and identification of the handwriting on the majority of the cut sheets as Petitioner's.[3]

For Ground Three, Petitioner argues that defense counsel was ineffective for failing to impeach Special Agent Ricchio during trial with her prior testimony during the May 27, 2011 motion to suppress hearing, that Petitioner was not frisked during the August 2006 search of his home, or to call witnesses who would have contradicted Ricchio's testimony that there was no local police presence during the search.  Petitioner argues that if defense counsel had discredited Ricchio's testimony in this regard, the jury would not have believed Ricchio's testimony that Petitioner lied to her during the August

_____

[3]     Petitioner points to additional examples of Tammy Perry's allegedly objectionable testimony in his reply brief.

16, 2006 interview (the last affirmative act of evasion necessary to bring the criminal charges within the statute of limitations), and at least some of the counts against him would have been time barred.

For Ground Four, Petitioner argues that defense counsel was ineffective during the plea negotiation stage, by (a) informing Petitioner that the funds seized in the civil forfeiture action could be used to pay restitution in his criminal case[4] and that Petitioner would not owe interest on any restitution ordered; (b) failing to convey a December 16, 2011 plea offer from the government; (c) failing to advise Petitioner of the possible sentence he could face if convicted at trial; and (d) failing to inform Petitioner, until shortly before trial, that Tammy Perry and Seib had proffer agreements with the government. Petitioner contends that he would have pleaded guilty if he knew that the seized funds could not be used to pay restitution and that he would owe interest on such restitution; if he received the government's formal plea offer and it was explained to him along with the higher sentence he could face if convicted at trial; or if he was earlier informed of Tammy Perry's and Seib's proffer agreements.

For his claim of prosecutorial misconduct, Ground Five, Petitioner argues that his due process rights were violated when (a) the government elicited and did nothing to

---

[4]      Although, as explained above, the government did eventually agree to apply a portion of the seized funds to the restitution owed in this case, it did not do so until nearly two years after Petitioner's conviction. Petitioner argues that had he known at the time of the plea bargaining stage that there was a chance that the funds seized from him in the civil forfeiture case would be unavailable to satisfy any restitution ordered after a trial and conviction in his criminal case, he would have accepted a plea offer in his criminal case.

correct the allegedly false testimony of Seib, and (b) the government did not correct defense counsel's assumption that the seized funds could be applied to Petitioner's restitution in this case.

With respect to Seib's testimony, Petitioner contends that, although Seib stated during a pre-trial interview with federal agents that he never submitted false invoices to Ford, he testified at trial that Petitioner had instructed him to inflate invoices. As another example of Seib's allegedly false testimony, Petitioner argues that although Seib testified at trial that he recognized handwriting on the cut sheets as Petitioner's, Seib only did so because Special Agent Ricchio told Seib during a February 20, 2009 interview that the cut sheets were Petitioner's.[5]

In a supplemental reply, filed with leave of the Court, Petitioner argues that Seib also falsely testified that he created an inflated invoice for approximately $2 million to $2.4 million during the time period of 2000 to 2002. Petitioner argues that a review of the government's evidence demonstrates that the only invoice for approximately $2.4 million that is reflected in the government's evidence is an invoice for $2,183,173, paid on May 3, 2001. Petitioner asserts in a supplemental declaration that Ford's payment system took 45-60 days for a supplier to be paid. Therefore, Petitioner argues that the $2,183,173 invoice would have been for work completed no sooner than March 15, 2001, which according to the testimony of other witnesses, predated the alleged fraudulent activity for which Petitioner was accused.

---

[5] Petitioner also argues that Seib falsely testified that he did not sign a proffer letter, but Petitioner acknowledges that the government corrected this testimony on redirect.

## Evidentiary Hearing of January 30, 2017

At the evidentiary hearing with respect to Ground Four (ineffective assistance during plea negotiations), the parties offered several exhibits into evidence, many of which were also attached to the parties' briefs and which established the following.

By letter dated September 8, 2011, defense counsel forwarded Petitioner a copy of an August 30, 2011 letter from Assistant United States Attorney ("AUSA") Reginald Harris. Petitioner received and reviewed this letter, which outlined the government's estimates of how the federal sentencing guidelines might apply in connection with any plea offer in this case. The government estimated that the recommended sentencing guideline range in connection with a plea would be 37 to 46 months in prison. This guideline range included a two-level enhancement for Petitioner's alleged use of "sophisticated means" in completing the offense. It also included a three-level reduction for Petitioner's acceptance of responsibility as part of a plea agreement. The letter stated that it was "only an estimate and not a formal plea offer." (Doc. No. 8-1 at 9-10.)

Petitioner also sent defense counsel various notes and emails outlining his own plea proposals. In a note from Petitioner to defense counsel dated November 3, 2011, titled "Plea Offer," Petitioner indicated that he was willing to plead guilty to one count, provided that he received no jail time and only probation, he was only held responsible for 50% of the tax loss owed (with his ex-wife responsible for the other 50%), the seized funds from the civil forfeiture action were returned to him after the tax loss was paid, no other civil or criminal charges or penalties were issued, and the plea agreement was "agreed by judge" so as to bind the Court. *Id.* at 12.

Another note from Petitioner to defense counsel dated November 11, 2011, outlined an alternative plea offer with similar conditions, including that Petitioner would plead guilty to two counts, for "no jail time with probation supervision" and payment of "50% of tax owed" with his ex-wife paying 50%, the funds seized by the government being returned to Petitioner, and the plea offer being "agreed by judge." *Id.* at 13.

An email from Petitioner to defense counsel dated November 15, 2011, and titled "Re: Plea Offer," asked defense counsel to give Petitioner a call regarding the following:

1) probation with no jail time.
2) If the case went to trial the first 2 counts would possibly get dropped because we believe we will be able to prove at trial that some of the statements the IRS agent made in writing over a 90 period are incorrect after the search warrant. This would [throw] out the first 2 counts. This is why we are asking for these first 2 counts to be dropped. . . .
3) The agreement must be approved by the judge first.
4) Do we want to add I have no criminal record.

*Id.* at 14.

On November 16, 2011, defense counsel sent a formal plea proposal to the government on Petitioner's behalf. *Id.* at 17. The proposal stated that Petitioner would be willing to plead guilty to two counts in exchange for a dismissal of the other counts. It also proposed responsibility for 50% of the tax loss for the tax years at issue in the two counts to be paid from the money seized by the government, with the balance of those funds being returned to Petitioner; probation with no prison time; no civil penalties or fines; no other charges against him; and approval of the agreement by the judge, among other conditions.

14

The government rejected Petitioner's plea proposal, but on December 16, 2011, the government sent defense counsel a formal plea offer by email. The plea offer was consistent with the government's August 30, 2011 letter. The plea offer provided that Petitioner would plead guilty to all four counts; Petitioner would agree to be bound by the advisory guidelines range of 37 to 46 months in prison, except for the possibility of obtaining a reduced sentence based on substantial assistance to the government; and Petitioner would make full restitution to the IRS in the amount of $649,997. The plea offer explicitly stated that it would not bind the Court. It also did not mention the funds previously seized by the government or state that those funds could be applied toward the restitution. *Id.* at 19-32. The government's cover email to defense counsel stated that the government needed an answer regarding its plea offer by the close of business on Friday, January 6, 2012, ahead of the February 21, 2012 trial setting. *Id.* at 32.

Defense counsel's billing records around this time included an entry dated December 19, 2011, stating "plea bargain offer from AUSA," and an entry two days later, on December 21, 2011, suggesting that defense counsel held an in-person conference with Petitioner that day. A letter dated December 23, 2011, from defense counsel to Petitioner, stated: "If we do not get a better offer from them by January 6, 2012, then we will have to prepare for trial."

On May 20, 2013, defense counsel sent Petitioner a letter regarding Petitioner's Wisconsin civil forfeiture case. Defense counsel stated in the letter that, according to the AUSA in the Wisconsin case, Petitioner had two options: either contest the forfeiture, which would risk the entire sum being forfeited to victims and no money being left to pay

off the restitution amount owed in this case, or agree to a settlement which would allow Petitioner to apply some portion of the seized funds toward the restitution amount in this case.  Defense counsel recommended the second option.  He also indicated that he (defense counsel) felt "betrayed" by the AUSA in Petitioner's Missouri criminal case because defense counsel had discussed a return of the seized funds to pay restitution "as part of any plea deal" in this case, and that the "AUSA never corrected this mistaken impression," instead simply saying "no" to defense counsel's plea proposal.  (Doc. No. 2-1.)

On May 21, 2013, Petitioner emailed defense counsel and referenced the plea bargaining stage of his Missouri criminal case.  In this email, Petitioner acknowledged that government had at some point asked him to plead guilty to all four counts and pay full restitution.

In addition to receiving the exhibits discussed above, the Court heard the testimony of Petitioner, Petitioner's current wife,[6] and defense counsel Dempsey at the evidentiary hearing.  Petitioner testified that he did not recall receiving a copy of the government's December 16, 2011 proposed plea agreement and that he believed the maximum sentence he could receive at trial was 33 to 37 months.  However, Petitioner acknowledged that defense counsel discussed with him the government's August 30, 2011 letter, in which the government estimated that the guideline range that would apply if Petitioner pleaded guilty was 37 to 46 months (the same range referenced in the December 16, 2011 plea offer).  Petitioner indicated that he understood that the 37- to 46-

---

[6]     Petitioner's current wife is also named Tamara Perry.

month range, which included a three-level reduction for acceptance of responsibility, would apply only if he pleaded guilty, but not if he went to trial. Petitioner further testified that he understood that the government's estimated guideline range for a plea agreement included a two-level sentencing enhancement based on the use of "sophisticated means," but Petitioner believed, based on the advice of defense counsel, that if he went to trial instead of pleading guilty, he could argue that the "sophisticated means" enhancement should not apply. With respect to the plea proposals he transmitted to defense counsel, Petitioner testified that he was aware that judges sometimes did not follow the recommendations of the parties, and that it was important to him that any plea agreement first be approved and agreed to by the judge.

Petitioner also testified that defense counsel advised him more than once that the funds seized in the Wisconsin civil forfeiture action would be available to pay off his restitution liability in this case, and that interest would not be added to his restitution liability. Petitioner did not recall seeing copies of the proffer agreements of Tammy Perry and Seib but testified that he learned of the proffer agreements just days before trial.

In response to repeated questions as to whether Petitioner would have accepted the government's December 16, 2011 plea offer had he seen it and had he not received what he claimed was bad advice by defense counsel, Petitioner wavered. Petitioner testified at various times that he would have "evaluated" the situation and "probably" would not have gone to trial; or that would have taken into account all of the "factors" and, if he knew all of the factors, he would have "tried to negotiate or take a plea offer." In

response to questioning by the government as to whether Petitioner would have been willing to admit, as the December 16, 2011 plea offer required, that he participated in fraudulent schemes, Petitioner testified that he would have discussed with the government the possibility of removing that and certain other items from the plea offer's statement of facts.

Petitioner's current wife testified that she had not seen the government's December 16, 2011 plea offer, or discussed that offer with Petitioner, until after Petitioner filed his § 2255 motion. She also testified that her understanding had always been that the funds seized in the Wisconsin civil forfeiture action were being held for victims of a crime, and she assumed that the only victim here was the IRS. On cross-examination, she admitted that she was not present during any of Petitioner's meetings with defense counsel.

Defense counsel Dempsey testified that he communicated the government's December 16, 2011 plea offer to Petitioner and explained its terms, including that it would involve Petitioner paying more money but likely receiving less time in prison than if convicted after trial. Dempsey testified that he explained to Petitioner that, if convicted at trial, Petitioner could face a higher sentence than that referenced in the plea offer, including a sentence of up to 46 to 60 months, or approximately four to five years. Dempsey testified that he explained to Petitioner that the plea offer included the possibility for a downward departure recommendation if Petitioner provided substantial assistance to the government, including by testifying in detail about Buske, but that the

plea offer's recommended sentencing guidelines range would not be binding on the Court.

Dempsey testified that Petitioner rejected the government's December 16, 2011 plea offer because Petitioner insisted on receiving no jail time and receiving a guaranteed sentence of probation, which is why Petitioner insisted on the Court approving any plea agreement. Dempsey testified that in all of his discussions with Petitioner, Petitioner insisted that he serve no jail time, and that Petitioner could be unreceptive to discussing other details if probation was not a part of the proposal. Because the government's plea offer did not include these terms, Petitioner did not want to discuss it further and was willing to take his chances at trial. Dempsey testified that neither the government nor Petitioner made any further plea offer after December 16, 2011.

Dempsey testified that he definitely reviewed the December 16, 2011, plea offer with Petitioner. But he could not remember whether he communicated the plea offer to Petitioner in person, by email, or by phone, and Dempsey acknowledged that he had no documentary evidence of such communication. However, Dempsey testified that his December 23, 2011 letter to Petitioner[7] and his billing records from that time referenced the government's December 16, 2011 plea offer, which he had previously gone over with Petitioner.

With respect to the seized funds in the Wisconsin civil forfeiture action, Dempsey testified that he never advised Petitioner that the funds would automatically be available

---

[7] Although Dempsey testified that he sent this letter to Petitioner, Petitioner could not recall receiving the letter from defense counsel.

to pay restitution in this case, regardless of the outcome of this case. Rather, Dempsey testified that he knew it would be difficult to argue the issue at trial but he believed that he could get the government to agree to such use of the funds as part of a plea agreement. Dempsey testified that when he stated in his May 20, 2013 letter to Petitioner that he (Dempsey) felt "betrayed" by the government in this case with regard to the use of the seized funds, he was referencing the fact that the government simply rejected Petitioner's plea proposals without making clear or specifically informing Dempsey that the government would never agree to applying the seized funds toward restitution in any plea agreement.

Finally, with respect to the proffer agreements for Tammy Perry and Seib, Dempsey testified that he and Petitioner knew early on, during discovery, of these two witnesses' anticipated testimony. Dempsey testified that he did not learn of the proffer agreements for Tammy Perry and Seib until February 2, 2012, and February 16, 2012, respectively, and that he showed the proffer agreements to Petitioner shortly after receiving them from the government. According to Dempsey, after discussing the proffer agreements, Petitioner never indicated that he wanted to plead guilty or reinitiate plea negotiations. Rather, Petitioner was "confident" with the strategy proposed by Dempsey, to use the proffer agreements to attack the witnesses' credibility at trial.

## DISCUSSION

In order to prevail on an ineffective-assistance-of-counsel claim, a petitioner must meet the two-prong test established by *Strickland v. Washington*, 466 U.S. 668 (1984): (1) he "must show that counsel's performance was deficient," so deficient that, "in light

of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) he must show "that the deficient performance prejudiced the defense," in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 690, 694. In measuring counsel's performance, courts apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. (citation omitted).

## Ground Four

Turning first to Petitioner's claim that defense counsel was ineffective in the plea bargaining stage of the case (Ground 4), it is clear that a defendant's Sixth Amendment right to counsel extends to this stage of a criminal case. *See Lafler v. Cooper*, 556 U.S. 156, 162-63 (2012) (citing *Missouri v. Frye*, 556 U.S. 133, 132 S. Ct. 1399 (2012)). The two-part *Strickland* test governs such claims. Specific to the plea context, defense counsel has a duty to communicate to a client a formal, favorable plea agreement from the government. *Frye*, 132 S. Ct. at 1408. In order to establish prejudice from the deficient performance of counsel in a case involving a plea offer, a petitioner is required to demonstrate a reasonable probability that he would have accepted the plea offer had he been provided with effective assistance of counsel. *See, e.g*., *Talavera v. United States*, 842 F.3d 556, 558 (8th Cir. 2016).

The Court's determination of Petitioner's entitlement to relief on his fourth ground depends on a credibility determination. In assessing the credibility of witnesses, the court properly may consider "variations in demeanor and tone of voice, as well as documents

and objective evidence that may contradict a witness' testimony or reveal inconsistencies. Additional considerations may include the witness' motive to lie and the specificity of a witness' statements." *Jackson v. United States*, No. 5:07-CR-110-FL-1, 2014 WL 7149635, at *4 (E.D.N.C. Dec. 15, 2014) (citations omitted).

The Court having heard the testimony at the January 30, 2017 evidentiary hearing and having had the opportunity to observe the witnesses, finds that defense counsel's account is credible and consistent with the record as a whole, whereas Petitioner's account is not credible. The Court credits defense counsel's testimony that he communicated the December 16, 2011 plea offer to Petitioner; that he reviewed with Petitioner the salient terms of that offer, including the 37- to 46-month sentence with possible downward departure and full restitution in exchange for a guilty plea; and that he informed Petitioner of the higher sentence Petitioner could receive if convicted at trial. Furthermore, defense counsel's testimony that Petitioner rejected the offer because he insisted on no jail time and a guarantee of probation is credible, and is supported by documentary evidence that Petitioner consistently insisted on no jail time and approval of the plea agreement by the Court, as part of each of his plea proposals.

The Court does not credit Petitioner's testimony to the extent that it conflicts with counsel's testimony. Specifically, the Court does not accept Petitioner's testimony that defense counsel never conveyed the December 16, 2011 plea offer to him and never explained to him the possible sentence he could receive if convicted at trial.

The Court does not believe that defense counsel acted outside the wide range of professionally competent assistance with respect to his advice about use of the seized

funds[8] and Tammy Perry's and Seib's proffer agreements. But in any event, Petitioner cannot demonstrate prejudice with respect to this advice, or with respect to defense counsel's advice that interest would not be added to the restitution order (an argument that defense counsel lost at trial).

The Court does not believe that Petitioner would have accepted the December 16, 2011 plea offer had he received what he believed was the correct advice. Petitioner's own testimony on this point was tenuous, at best. Indeed, it is evident that Petitioner viewed an offer as simply a starting point for negotiations and seems to believe that the government would somehow need to improve the offer in deference to his arguments regarding the statute of limitations and whether he used sophisticated means. More importantly, however, and as noted above, the record reflects that Petitioner insisted on a guaranteed sentence of probation as part of any plea agreement. The credible testimony and evidence shows that a guaranty of no prison time was the single most important term to Petitioner throughout the plea discussions, and his position never changed. As such, the availability of the seized funds, the application of interest, and Tammy Perry and Seib's proffer agreements were not material factors.[9] The Court will deny relief on

---

[8]    As the government correctly notes, even if defense counsel advised Petitioner that the funds could potentially be applied to a restitution order after trial in this case, such advice was not necessarily erroneous. Neither this Court nor the Eighth Circuit prohibited the funds from being so applied. Rather, both courts declined to address the issue until the civil forfeiture proceeding was concluded. The parties never brought the issue back before the Court, presumably because the parties agreed by settlement to apply a portion of the funds to Petitioner's restitution liability in this case.

[9]    The immateriality of Tammy Perry's and Seib's proffer agreements is also evidenced by the fact that, although Petitioner learned of these agreements shortly before

Ground Four.  Petitioner's remaining claims also fail.

## Grounds One and Two

With respect to Grounds One and Two, "[t]o obtain relief on a claim that counsel was ineffective for failing to object to evidence, a § 2255 movant must show that there is a reasonable probability that if an objection had been made, it would have been sustained, and the result of the proceeding would have been different."  *McCloud v. United States*, No. 4:11-CV-1721 CAS, 2015 WL 224990, at *23 (E.D. Mo. Jan. 15, 2015) (citations omitted).

Petitioner's claim in Ground One fails because an objection to evidence of Petitioner's involvement in the fraudulent scheme would have been overruled, such schemes constituting the source of Petitioner's unreported taxable income and evidence of Petitioner's criminal intent in relation to the federal prosecution for tax evasion. "Numerous cases have upheld the admission of highly prejudicial evidence that was inextricably tied to proving the taxable nature of the income."  *United States v. Abodeely*, 801 F.2d 1020, 1026 (8th Cir. 1986) (citing similar tax evasion cases where evidence of income derived from assassination attempts, extortion, loansharking, prostitution, and unsavory business dealings was held to be admissible).  Further, the fraudulent source of the funds is relevant to Petitioner's willful concealment, and the falsity of his representations to Special Agent Ricchio.  And though some form of limiting instruction that Petitioner was on trial for tax evasion and not fraud could have been requested, such

---

trial, he never sought to reinitiate plea negotiations with the government at that time or any time thereafter.

an instruction would have made little difference, because it would not have limited or changed the way the government proved its case. In light of the significant evidence of Petitioner's guilt at trial, Petitioner can show no prejudice. *See United States v. Joos,* 638 F.3d 581, 588 (8th Cir. 2011) (concluding that the absence of a limiting instruction did not affect the defendant's substantial rights where the government presented substantial evidence at trial supporting his convictions).

Petitioner's claim in Ground Two likewise fails because an objection to Tammy Perry's testimony based on the martial confidential communications privilege would have been largely overruled. As the government correctly notes, "[u]nder the marital confidential communications privilege, it is well settled that the communications to which the privilege applies have been limited to utterances or expressions intended by one spouse to convey a message to another." *United States v. Espino*, 317 F.3d 788, 795 (8th Cir. 2003). "Though this privilege has been expanded to encompass more than mere conversations and writings, invocation of the privilege requires the presence of at least a gesture that is communicative or intended by one spouse to convey a message to the other." *Id.*

A review of Tammy Perry's testimony reveals that the portions cited in Petitioner's motion and the additional testimony cited in his reply brief[10] were, for the

---

[10]     The Court need not address the additional allegedly objectionable testimony raised for the first time in Petitioner's reply brief. *See Smith v. United States*, 256 F. App'x 850, 852 (8th Cir. 2007) (holding that the "the district court did not err in dismissing claims raised for the first time in a § 2255 reply brief"). But in any event, the Court finds that most of this testimony was not protected by the marital confidential communications privilege, and to the extent some small portions of the testimony were protected, defense

most part, not protected by the marital confidential communications privilege. Tammy Perry's testimony focused largely on her own conduct and her "observations of [Petitioner's] conduct and actions involving his [allegedly fraudulent schemes]," which the Eighth Circuit has held to fall outside the scope of the privilege. *Id.; see also United States v. Miller*, 588 F.3d 897, 905 (5th Cir. 2009) (holding that the testimony of the wife of a criminal defendant charged with tax evasion, regarding the "practice of processing payments that were made to the medical clinic," was "not privileged because it refers to acts, not communications"). With respect to the few items of testimony that do appear to relate to confidential communications by Petitioner to his wife,[11] the Court concludes that in light of the rest of Tammy Perry's testimony and the other corroborating evidence at trial, there is no reasonable probability that exclusion of this testimony would have changed the outcome of the trial.

## Ground Three

The Court's observance of defense counsel's performance at trial, and a review of the trial transcript, does not support Petitioner's claim that defense counsel provided constitutionally ineffective assistance during the cross-examination of Ricchio. To the contrary, defense counsel engaged in effective cross-examination of Ricchio. To the extent that Ricchio's testimony was, in fact, inconsistent as to the minor issues of whether local police were present or Petitioner was frisked during the search—of which the Court

---

counsel's failure to object in this regard was not prejudicial.

[11]     For example, as Petitioner notes in his reply brief, Tammy Perry testified that Petitioner told her "he'd go straight once [the couple] got to Colorado." (Doc. No. 13 at 11-12.)

is not convinced—defense counsel's decision not to focus on such trivial details was not ineffective. *See Poyner v. Iowa*, 990 F.2d 435, 438 (8th Cir. 1993) (holding that defense counsel's failure to "develop every bit of testimony through all available inconsistent statements" was not ineffective). In any event, Petitioner has not shown that "impeaching" Ricchio on such minor inconsistencies would have cast doubt on Ricchio's incriminating testimony that Petitioner falsely denied involvement in the fraudulent schemes, or would have otherwise impacted the outcome of the trial.

**Ground Five**

With respect to Ground Five, "[t]he test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial." *United States v. Rodriguez*, 612 F.3d 1049, 1055-56 (8th Cir. 2010)

To prevail on Ground 5(a), on the basis of Seib's allegedly false testimony, Petitioner must prove "1) that the prosecution's case includes perjured testimony, 2) that the prosecution knew or should have known of the perjury, and 3) that there was a reasonable likelihood that the false testimony could have affected the judgment of the jury." *See United States v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992). Here, Petitioner has not offered any evidence that Seib's testimony was perjured, as opposed to merely inconsistent with other witnesses' statements or his own previous statements. *See United States v. Martin*, 59 F.3d 767, 770 (8th Cir. 1995) ("Mere inconsistency between witnesses' testimony is not necessarily perjury, and not every contradiction is material.

A challenge to evidence through another witness or prior inconsistent statements is insufficient to establish prosecutorial use of false testimony.") (citations omitted); *Murray v. Delo*, 34 F.3d 1367, 1375–76 (8th Cir. 1994) ("[I]t often happens that witnesses contradict themselves in statements given from time to time. Such contradictions are material for cross-examination, and may cause the jury to disbelieve the witnesses. They do not, without more, establish perjury.").  Nor has Petitioner presented any information, whatsoever, that the prosecutor knew or should have known of any alleged perjury.

Petitioner's supplemental reply does not help Petitioner either, because the exhibit on which Petitioner relies—the $2,183,173 invoice paid on May 3, 2001—is consistent with Seib's testimony that he created an invoice for approximately $2 million to $2.4 million sometime during the time period of 2000 to 2002.  Whether the government sufficiently established that the invoice was part of the fraudulent scheme on which Petitioner's convictions were based is a different question, and one that is not properly before this Court.  Petitioner had the opportunity to cross-examine Seib, to point out any alleged inconsistencies in his testimony, and to argue to the jury that he was not credible. He has not established prosecutorial misconduct in this regard.

With respect to Ground 5(b), Petitioner has not shown that the prosecutor's conduct, in failing to correct defense counsel's "assumption" that the seized civil forfeiture funds would be available to satisfy Petitioner's restitution liability, was improper.  Indeed, as discussed above, to the extent defense counsel made such an assumption, it was not necessarily incorrect.  Moreover, Petitioner has not cited, and the

Court has not found, any authority suggesting that the prosecutor had a duty to explain the consequences of a restitution order to Petitioner. And Petitioner's request with respect to the seized funds was only one of many terms proposed by Petitioner in his plea proposal, all of which were unacceptable to the prosecutor. The prosecutor had no obligation to address each separately in rejecting Petitioner's proposal. Finally, although Petitioner argues that he was prejudiced because, but for the prosecutor's conduct, he would have accepted the plea offer, the Court has already found that this assertion is not credible.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner John K. Perry's motion filed under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence is **DENIED**.

**IT IS FURTHER ORDERED** that this Court will not issue a Certificate of Appealability as Petitioner has not made a substantial showing of the denial of a federal constitutional right as required by 28 U.S.C. § 2253(c)(2).

A separate Judgment shall accompany this Memorandum and Order.

.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 13th day of February, 2017.